IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| HOLLY R. VEJVODA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No: 09 C 7677 |
| v. ) | |
| ) | Magistrate Judge Jeffrey Cole |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## MEMORANDUM OPINION AND ORDER

The plaintiff, Holly Vejvoda, seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying his applications for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"). 42 U.S.C. §§ 423(d)(2). Ms. Vejvoda asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

I.

PROCEDURAL HISTORY

Ms. Vejvoda applied for DIB on February 6, 2007, alleging that she had become disabled on June 25, 2006, due to rheumatoid arthritis and a cancerous bladder tumor. (R. 126, 183). Her application was denied initially and upon reconsideration. (R. 70-76, 89-93). Ms. Vejvoda filed a timely request for a hearing. An ALJ held a hearing on May 21, 2009, at which Ms. Vejvoda, represented by counsel, appeared and testified. (R. 24-69). In addition, James Breen testified as a vocational expert. (R. 61-68). On June 15, 2009, the ALJ issued a decision finding that Ms. Vejvoda was not disabled because she

retained the capacity to perform her past sedentary work as a telephone operator and customer service clerk. (R. 6-23). This became the final decision of the Commissioner when the Appeals Council denied Ms. Vejvoda's request for review of the decision on October 23, 2009. (R. 1-3). *See* 20 C.F.R. §§ 404.955; 404.981. Ms. Vejvoda has appealed that decision to the federal district court under 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## II.

## EVIDENCE OF RECORD

### A.

### Vocational Evidence

Ms. Vejvoda was born on October 22, 1952, making her fifty-six years old at the time of the ALJ's decision. (R. 29). She has a GED. (R. 189). She is 5'8½" and weighs 224 pounds. (R. 165). Her most recent job was as an assistant cook in a high school cafeteria, and prior to that, she had a part-time job as a crossing guard. (R. 184). The longest position she held was in customer service, from 1995 through 200. (R. 184). She quit her assistant cook job in December 2006 because of her impairments. (R. 183-84). At the time of her hearing, she was working 20 hours a week at a hot dog stand, manning the register and preparing food. (R. 30, 38).

### B.

### Medical Evidence

It appears as though Ms. Vejvoda's back problems began in January 2005. On the 25th of that month, she went to the Rush-Copley emergency room, complaining of

back pain and right leg pain and numbness. (R. 480-86). Gait was normal, as were motor and sensory exams. (R. 482). Straight leg raising produced pain on the left, although not on the right. (R. 482). This later subsided. (R. 483). Extremities were normal. (R. 482). She was discharged o n Vicodin and Ibuprofen. (R. 485).

Thereafter, she was treated by Dr. Samuel Farbstein. An MRI of the lumbar spine performed on February 1, 2005, revealed: mild to moderate degenerative facet disease throughout the lumber spine; small broad-based disc protrusion at L5-S1; disc bulging with right foraminal protrusion and osteophyte causing foraminal stenosis at L4-L5; diffuse disc bulge and osteophytes causing bilateral foraminal stenosis at L3-L4; minimal degenerative changes at L2-L3; and diffuse disc bulge with moderate-sized disc protrusion and foraminal stenosis at L1-L2. (R. 583).

An X-ray on November 29, 2006, showed moderate degenerative facet changes at L4-5 and L5-S1. (R. 323). Ms. Vejvoda had a nerve conduction study on December 4, 2006. It was within normal limits aside from a mild amplitude reduction in the sural sensory response, which was not of adequate severity to explain her symptoms. Overall, the results were nondiagnostic of radiculopathy, but given the limitations of the test, an MRI was recommended. (R. 321). Dr. John Wyatt evaluated Ms. Vejvoda on December 29, 2006. Her strength, reflexes, sensation, and gait were all normal. Straight leg raising was negative. Flexion of her lumbar spine was limited to 45 degrees. (R. 350). Dr. Wyatt recommended epidural steroid injections. (R. 351).

Ms. Vejvoda received epidural steroid injections on February 16, 2007, and March 6, 2007. (R289, 291). She followed up with her primary physician, Dr. Farbstein, on May 21, 2007, and was referred for physical therapy. The initial physical therapy

evaluation noted that Ms. Vejvoda had a full range of motion in her lumbar spine, but did have some pain. Strength and reflexes were normal, and straight leg raising was negative. (R. 464). Ms. Vejvoda reported that three steroid injections had helped her back pain but not her leg pain. (R. 464). She was taking Ibuprofen and Vicodin at the time. (R. 464).

On April 11, 2007, Dr. M.S. Patil examined Ms. Vejvoda at the request of the Agency. Ms. Vejvoda reported "constant mild pain in the low back area, radiating to the right leg." (R. 443). The pain worsened when she stood for three minutes or sat for thirty minutes. (R. 443). She said she couldn't walk more than a block. (R. 443). She denied any bladder dysfunction. (R. 443). She was taking Diltiazem and Hydrocodone. (R. 443). Upon examination, there was no paravertebral tenderness or spasm. (R. 445). Reflexes, strength, and sensation were normal. (R. 445). Range of motion in the lumbar spine was limited to 50/90 degrees flexion, 20/25 extension, 20/25 lateral flexion. (R. 445). Straight leg raising was positive at 25 degrees bilaterally. (R. 445). There was a full range of motion in all extremities, and grip strength and manipulation were normal. (R. 445). Dr. Patil noted that Ms. Vejvoda's BMI (body mass index) was over 35, meaning she was Class II obese. (R. 446).

Dr. Jiminez reviewed Ms. Vejvoda's medical record on April18, 2007. He felt she could perform a full range of light work activity. She could stand or walk about six hours per eight hour workday and sit for the same period of time. The doctor characterized her arthritis as "mild". (R. 448-55).

On July 2, 2007, Dr. Farbstein noted that Ms. Vejvoda had just started on arthritis and cholesterol medication, and was not complaining of any worsening problems with

4

her back and joints. (R. 725). She was also starting physical therapy. (R. 725). The doctor said he would take care of her "form regarding disability." (R. 726).

To that end, Dr. Farbstein provided an assessment of his patient's ability to do work related activities on July 5, 2007. The doctor had been treating his patient for over ten years. He diagnosed cervical disc disease, lumbar disc disease with sciatica, lower extremity arthritis and a history of bladder cancer. He said that Ms. Vejvoda had recovered from cancer, but her sciatica had gotten worse – she had not had a good response to conservative treatment. (R. 468). She had poor tolerance for both sitting and standing. (R. 468). The doctor felt that Ms. Vejvoda could sit, stand, and walk for only three hours in a workday. (R. 469). He said that she experienced paresthesia that was improved if her legs were elevated. (R. 469). He said she needed to lie down intermittently during the day due to her "back fatigue caused by disease process & pain medication." (R. 469). He noted she could carry twenty pounds occasionally and ten pounds frequently, but had limitation in her ability to grasp and handle objects due to bursitis in her right shoulder. (R. 469). Her medication caused her fatigue, nausea, and weight gain. (R. 470). She would have marked limitations on her ability to complete a normal work day and work week or to maintain a consistent pace without an unreasonable length and number of rest periods. (R. 470). A month later, in August 2007, Dr. Farbstein reported that Ms. Vejvoda stopped taking her cholesterol medication out of laziness. (R. 727). He said her back problems were better with physical therapy. (R. 727).

On February 4, 2008, Dr. Farbstein said Ms. Vejvoda complained of back pain radiating down the right leg and some loss of leg strength. (R. 729). She reported no

urinary problems since her surgery. (R. 729). The doctor prescribed some steroids and stated that if those resulted in improvement, he would refer her for an injection. (R. 730). By February 25th, Ms. Vejvoda was reporting mid-back pain and there was obvious spasm around the paralumber/parathoracic muscle group. (R. 731). Dr. Farbstein had her continue with narcotic pain relievers. (R. 732).

On March 17, 2008, Ms. Vejvoda had no back pain, but there was some crepitation upon movement of her knees. (R. 733-34). He was hopeful that she would get her weight down in the next two months. (R. 734). On April 28, 2008, Ms. Vejvoda complained of some low back pain she thought felt like a bladder infection. (R. 735). A month later, Ms. Vejvoda returned, having twisted her ankle at work. (R. 737). There was some swelling and tenderness. (R. 738). The doctor recommended she use a cane, and gradually build up weight-bearing tolerance. (R. 738). On June 2nd, Dr. Farbstein noted that there was still some swelling and thought she should remain off work until the following week. (R. 740). The ankle improved and, by June 16th, she was back to full weight-bearing status. (R. 745. Ms. Vejvoda was instructed to exercise and get her weight down. (R. 745). At physical therapy on the 28th, Ms. Vejvoda exhibited a full range of motion in her lumbar spine, with some pain at full extension and flexion. (R. 795). She said she was limited in standing and long-distance walking and had to sit frequently due to pain. (R. 795).

On January 19, 2009, Ms. Vejvoda reported that she had almost fallen down some stairs due to back, right leg, and right buttock pain. (R. 750). Straight leg raising was normal. (R. 751). There were no deep tendon reflexes, but lower extremity and hip examination were otherwise normal. (R. 751). She went to physical therapy on February

8th, and it was noted that she walked with a very short stride. (R. 797). Strength was 3/5 in her hips, 1/5 in her abdomen, and 4/5 throughout the rest of her lower extremities. (R. 797). Straight leg raising was negative, as was the slump test for nerve entrapment. (R. 797). When Ms. Vejvoda returned on the 20th, her stride was normal. (R. 796). Her strength was unchanged, but straight leg raising was positive. She was making positive gains with decreasing pain and slight improvement in functioning. (R. 796).

On March 16th, Ms. Vejvoda said she had some back and leg pain, but was active without difficulty. (R. 753). She denied any urinary symptoms. (R. 753). On April 2nd, Dr. Farbstein said he was "happy with her blood pressure, happy with her knee for the most part . . . ." (R. 755). On June 4, 2008, an MRI of Ms. Vejvoda's lower back revealed moderate to severe right foraminal stenosis at L3-4, as well as moderate left foraminal stenosis. "The central component ha[d] progressed and there ha[d] developed moderate central stenosis since prior exam." (R. 782). At L5-S1, there was mild left foraminal stenosis which was new since the prior exam, secondary to progressive diffuse disc bulging and endplate osteophytes. (R. 783).

As Dr. Farbstein indicated, Ms. Vejvoda has received treatment for bladder cancer. Dr. Jae Kim performed surgery and cystoscopy with removal of the bladder tumors on July 7, 2006. (R. 368). Ms. Vejvoda underwent a repeat biopsy and cystoscopy, followed by chemotherapy in January 2007. (R. 293). On November 1, 2007, she went to the Christ Hospital emergency room for acute cystitis. She underwent bladder catheterization. (R. 592). She also had an exploratory laparotomy and closure of the cystotomy. A cystogram demonstrated the presence of perforation and leakage of the

bladder. Bladder capacity was diminished. (R. 767). On May 5, 2008, Ms. Vejvoda was treated for a small bowel obstruction. (R. 675-80).

On September 19, 2008, she underwent another cystostomy and bladder biopsy due to the suspicion of erythematous lesions. The pathology revealed moderate chronic cystitis. (R. 701-702, 714). She saw Dr. Kim on May 4, 2009, and complained of urinary urgency. (R. 709).

## C.

### Administrative Hearing Testimony

#### 1.

#### Plaintiff's Testimony

Ms. Vejvoda said that she had been working at the hot dog stand for two years. (R. 30). Originally, she worked full-time, but it was too much for her and she had to reduce her hours after about a month. (R. 30-31). The job requires her to stand, although she was allowed to sit when things are slow. (R. 30). She runs the cash register and makes the food. (R. 38). She doesn't have to lift too much, perhaps five pounds. (R. 39). She is able to stand for about an hour and a half at a time, or about an hour if she is bending. (R. 38). She sometimes misses work when she has a doctor's appointment or is sick; sometimes she is achy and can't get out of bed. (R. 49). But she hasn't missed often; perhaps twice in three months. (R. 49).

She quit her last full-time job as an assistant cook at the junior high cafeteria because "it got to be too much, on [her] feet for eight hours, too much lifting, pulling." (R. 31). She said it was too hard for her to work full time any more: if she sits too long, it hurts; if she stands too long, it hurts. (R. 32). She is limited in lifting. (R. 32). When

she walks, her leg buckles and she falls. (R. 32). She uses a cane to get out of her car. (R. 41).

The residual effects of her bladder cancer caused her to use the washroom frequently. (R. 33). She stopped once to use the washroom during her drive to the hearing. (R. 50). During the hearing, she said she was experiencing low back pain and pain shooting down her right leg all the way to her foot. (R. 42). She took Norco for pain as needed. (R. 43). She has had steroid injections, the last one being about two years before her hearing. (R. 43, 46). That treatment was discontinued while her physician focused on her bladder cancer. (R. 46).

Her husband has to help her in the shower so she won't fall. (R. 34). When she combs her hair, she has to sit down. (R. 34). She is able to drive, and she drove to her hearing which was an hour trip. (R. 34). She cooks and does the dishes, but her husband helps with the laundry because the washer and drier are downstairs. (R. 35). She is able to do the grocery shopping. (R. 36). On a typical day, she would take her dog out, let it in, and feed it; shower if she had not done so the night before; then get ready for work. (R. 36-37). She works from 10:30 a.m. to 3:00 p.m. (R. 37). When she gets home, she takes care of the dog again and fixes dinner. (R. 37). After that, she makes her husband's lunch for the next day, watches television, and goes to bed about 9:30 p.m. (R. 37).

Bending over exacerbates her back pain. (R. 51). She has to lie down for a little bit when she comes home from work, and elevate her feet because they swell up during the day. (R. 51). She used to bowl, but she had to give that up. (R. 53). She also had to give up riding her bike and gardening. (R. 54-55). Her husband helps with the heavier

housework, such as moving furniture to vacuum. (R. 57). She sleeps five or six hours a night, and has to get up to use the bathroom four or five times. (R. 58).

**2.**

**Vocational Expert's Testimony**

James Breen then testified as a vocational expert. He classified Ms. Vejvoda's past work as medium, unskilled work as a kitchen helper, sedentary, semiskilled work as a customer service and telephone order clerk, and light, unskilled work at the hot dog stand. (R. 63). The ALJ asked the VE to assume a person were limited to light work, with no climbing of ladders, ropes, or scaffolds, occasional climbing of ramps and stairs, occasional balancing, stooping, kneeling, crouching, and no concentrated exposure to unprotected heights. The VE said the person could perform Ms. Vejvoda's past work as a telephone order clerk and a customer service clerk. (R. 63). If the person were further limited to sedentary work, the person could still perform those jobs. (R. 64). This would hold true even if the individual had to alternate between sitting and standing and be allowed to be off task ten per cent of the time, or if the person could only occasionally reach overhead, and frequently perform gross and fine manipulations. (R. 64). The ALJ added the additional limitation that the person be limited to simple, routine tasks. That added restriction would not allow the person to work as a telephone order or customer service clerk. (R. 65). Such a person could perform other work in the regional economy, however. (R. 65).

The VE further testified that workers were customarily allowed ten to twelve absences per year. (R. 65). There would be two fifteen-minute breaks and a thirty- or sixty-minute lunch. (R. 65). Unscheduled breaks would not be tolerated. (R. 65-66). In

response to questioning by Ms. Vejvoda's attorney, the VE said a person wouldn't be able to keep her feet elevated all day at work. (R. 67). The use of a cane, however, would not preclude work as a telephone order or customer service clerk. (R. 67). A person who had to lie down during the day, could and perform very little manipulation, reaching, pushing, and pulling, would not be able to work. (R. 68).

### D.

### ALJ's Decision

The ALJ found that Ms. Vejvoda suffered from the following severe impairments: "hypertension, disorders of the spine, discogenic and degenerative; chronic pain syndrome; and rheumatoid arthritis. (R. 12). He noted that she was status post bladder cancer, in remission, which caused only a slight abnormality and resulted in just a minimal effect on her ability to work. (R. 12). He also noted that she was obese, and said that he considered this in determining her level of functioning. (R. 12). The ALJ reviewed the medical evidence, and determined that Ms. Vejvoda did not have an impairment or combination of impairments that met or equaled a listed impairment. (R. 30). He specifically considered listings 1.02 and 1.04, covering major dysfunction of a joint and disorders of the spine. (R. 13).

Next, the ALJ determined that Ms. Vejvoda could perform sedentary work that required no more that occasional climbing of ramps and stairs, balancing, stooping crouching, or kneeling, but no climbing of ropes, ladders, or scaffolds, and no concentrated exposure to unprotected heights. (R. 13). Under the regulations, sedentary work "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is

defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a). The ALJ found that Ms. Vejvoda's "statements concerning the intensity, persistence and limiting effects of [her] symptoms [were] not entirely credible." (R. 33). The ALJ said that Ms. Vejvoda's course of medication had been successful in resolving or improving her condition, and noted that she alleged no side effects. (R. 15). He stated that Ms. Vejvoda's husband reported that his wife prepared meals daily, cleaned, did the laundry, occasionally mowed the lawn, did yard work, and could lift 15-20 pounds. (R. 15). She shopped every other day for 3 to 4 hours, and went bowling once a week. (R. 15). This was drawn from a report provided two years before Ms. Vejvoda's hearing. (R. 15; 219-26). The ALJ further noted that Ms. Vejvoda's daughter reported that she was able to clean, iron, vacuum, do laundry, do yard work, wash floors, and wash windows. (R. 15). It's unclear when this report was prepared or where it is in the record.[1]

The ALJ went on the remark that Ms. Vejvoda was able to participate fully in her hearing and did not appear to be in overt pain or distracted. (R. 15). Reviewing the medical record, the ALJ felt that, while it undoubtedly demonstrated that she experienced some pain and limitations, it did not support the extent of her complaints. (R. 16-18). The ALJ rejected the opinion of her treating physician that she was essentially disabled because the ALJ considered it to have be based on an uncritical acceptance of Ms. Vejvoda's complaints. (R. 17). Given Ms. Vejvoda's residual functional capacity, the

---

[1] The ALJ cites to Exhibit 6E, but that is a statement from Ms. Vejvoda, not her daughter, and it does not list the activities the ALJ points to. (R. 210-14).

12

ALJ determined that she could perform her past work as a telephone order clerk or a customer service clerk and, therefore, was not disabled under the Act. (R. 18-19).

IV.

DISCUSSION

A.

**Standard of Review**

The applicable standard of review of the Commissioner's decision is a familiar one. The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. §§ 405(g). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept to support a conclusion.'" *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010)(*quoting Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The court may not reweigh the evidence, or substitute its judgment for that of the ALJ. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009); *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). Where conflicting evidence would allow reasonable minds to differ as to whether the claimant is disabled, it is the ALJ's responsibility to resolve those conflicts. *Elder v. Astrue*, 529 F.3d 408, (7th Cir. 2008); *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

While the standard of review is deferential, the court cannot act as a mere "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). An ALJ is required to "minimally articulate" the reasons for his decision.

*Berger*, 516 F.3d at 544; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Although the ALJ need not address every piece of evidence, the ALJ cannot limit his discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the claimant a meaningful judicial review. *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009). The Seventh Circuit calls this building a "logical bridge" between the evidence and the ALJ's conclusion. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996).

## B.

### Five-Step Sequential Analysis

The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

1) is the plaintiff currently unemployed;

2) does the plaintiff have a severe impairment;

3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;

4) is the plaintiff unable to perform his past relevant work; and

5) is the plaintiff unable to perform any other work in the national economy?

20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. 20 C.F.R. §416.920; *Briscoe*, 425 F.3d at 352; *Stein v. Sullivan,* 892 F.2d 43, 44 (7th Cir. 1990). A negative answer at any point, other than step 3, stops the inquiry and leads to a

determination that the claimant is not disabled. 20 C.F.R. §404.1520; *Stein*, 892 F.2d at 44. The claimant bears the burden of proof through step four; if it is met, the burden shifts to the Commissioner at step five. *Briscoe*, 425 F.3d at 352, *Brewer v. Chater,* 103 F.3d 1384, 1391 (7th Cir. 1997).

## C.

### Analysis

Ms. Vejvoda has a few problems with the ALJ's opinion. First and foremost appears to be the ALJ's failure to address her chronic cystitis and frequent need to urinate. She argues that the ALJ merely mentioned that she had recovered from bladder cancer. According to her, her urinary problems would preclude her from performing any work because of her need for frequent breaks.

At her hearing, Ms. Vejvoda said she was incontinent "a little," had to use the restroom frequently, and this interfered with her activities. (R. 33). Discussing this particular impairment in his opinion, the ALJ said:

> The claimant is also status post bladder cancer, now in remission. Medical and other evidence establish that this impairment causes only a slight abnormality . . . that has no more than a minimal effect on the claimant's ability to do basic work activities. . . . The claimant's representative reported that the claimant's bladder condition is primarily under control, but that the claimant still experiences fatigue from treatment and has frequency of urination.

(R. 12). The ALJ went on to summarize Ms. Vejvoda's bladder cancer treatment. He did not discuss her testimony on this subject, or the medical evidence regarding her chronic cystitis.

As the Commissioner's brief points out, an ALJ need not discuss every piece of evidence in the record. *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010); *Terry v.*

*Astrue,* 580 F.3d 471, 477 (7th Cir.2009). By the same token, however, he is not permitted to neglect an entire line of evidence that impinges on the issue of disability. *Jones*, 623 F.3d at 1160; *Terry,* 580 F.3d at 477. Here, it could be argued that the ALJ neglected an entire line of evidence – that evidence regarding Ms. Vejvoda's cystitis – but he did at least mention the symptom of urinary frequency. That he atributed it to the residuals of bladder cancer is not as important as the fact of the symptom itself.

The problem is that the ALJ didn't analyze the symptom – he didn't discuss Ms. Vejvoda's allegations about it or its effect on her ability to work. Maybe he just didn't believe that the symptom was as bad as Ms. Vejvoda said it was, but he didn't explain why he didn't find her allegations credible. An ALJ has to provide specific reasons for disregarding a claimant's complaints. *Myles*, 582 F.3d at 676; *Villano v. Astrue,* 556 F.3d 558, 562 (7th Cir.2009); *Moss v. Astrue,* 555 F.3d 556, 561 (7th Cir.2009). In this case, the ALJ accepted that urinary frequency was a symptom, but dismissed it as only a slight abnormality. (R. 12). The only support he provided was evidence dealing with Ms. Vejvoda's course of treatment for her bladder cancer. (R. 12). None of that evidence says anything about the symptoms she suffers from her cystitis or, more importantly, their severity.

The ALJ couldn't just simply dismiss urinary frequency as inconsequential; it is something that could well affect an individual's ability to work. *See, e.g., Myles*, 582 F.3d at 676 (stating that affects of polyuria on ability to work must be considered even if it is a non-severe impairment); *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003)("Incontinence [two to three times a month] constitutes an impairment under the Social Security Act that must be considered to determine whether an applicant is

disabled."). In fact, at the hearing, the VE testified that an individual who had to take unscheduled breaks throughout the day would be unemployable. (R. 65-66). Ms. Vejvoda's cystitis may not require her to do that; it may indeed be inconsequential, but the ALJ supplied no analysis to explain why he disbelieved Ms. Vejvoda.

That is not to say that the record does not contain possible reasons to support a finding that Ms. Vejvoda's allegations were not credible and that she could work despite her symptoms. But the ALJ didn't cite them as bases for disbelieving Ms. Vejvoda. For example, Ms. Vejvoda repeatedly reported she had no bladder problems to her treating physician, Dr. Farbstein, but the ALJ didn't make that a part of his calculus. She continued her part-time job despite her impairment, but the ALJ didn't go into this in regard to her urinary frequency, neither in his opinion nor at the hearing. The Commissioner points out that Ms. Vejvoda's urologist released her for work in January 2008 with the only restriction being that she lift no more than ten pounds at a time. (*Defendant's Response*, at 3-4). But the rationale of the Commissioner's able lawyers is not before the court for review – the ALJ's rationale is. *McClesky v. Astrue*, 606 F.3d 351, 354 (7th Cir. 2010); *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010); *Golembiewski*, 322 F.3d at 916. The ALJ didn't mention this in his analysis.

So, a remand is in order for the ALJ to consider Ms. Vejvoda's cystits and resultant symptoms, and to fully assess her allegations regarding this impairment. Along the way, a few other problems with the ALJ's decision should be considered. At the hearing, Ms. Vejvoda testified that her medication caused her to be groggy or light-headed to the extent that she was afraid to take them if she was leaving the house. (R. 43, 58). The ALJ – who must consider the side effects of medication in assessing a

claimant's complaints, 20 C.F.R. §404.1529(c)(4)(iv) – did not address this testimony. Nor did he address Dr. Farbstein's statement that Ms. Vejvoda's medication regimen caused her fatigue, nausea, and weight gain. (R. 470). In fact, the ALJ said that Ms. Vejvoda "has not alleged any side effects from the use of [her] medications." (R. 15). He cited to a disability report Ms. Vejvoda made, apparently in 2007. (R. 236). Now, he might have arguably found Ms. Vejvoda's allegations at her May 2009 hearing to be not credible given the absence of any mention of side effects in her earlier report, but he couldn't simply ignore her testimony. *See Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009)(ALJ erred when he said claimant had not reported any side effects from her medication).

Moreover, while the ALJ listed four of the medications Ms. Vejvoda takes, he neglected to mention that she takes Norco – or hydrocodone – for pain. (R. 15). Judging from Ms. Vejvoda's hearing testimony, this was the pill that caused her the most severe side effects. That's not terribly surprising, as this drug is a strong narcotic. The Seventh Circuit has "deemed it improbable that a claimant would undergo pain-treatment procedures such as heavy doses of strong drugs in order to increase chances of obtaining disability benefits or that doctors would prescribe these treatments if they thought she were faking." *Goble v. Astrue*, – F.3d –, –, 2010 WL 2776563, *3 (7th Cir. 2010)(citing *Diaz v. Prudential Ins. Co. of Am.,* 499 F.3d 640, 646 (7th Cir.2007); and *Carradine v. Barnhart,* 360 F.3d 751, 755 (7th Cir.2004)). It's not clear from the decision whether the ALJ knew, or considered, the fact that Ms. Vejvoda had been prescribed and was taking such strong medication, let alone what the side effects may have been.

Addressing Dr. Patil's consultative examination report, the ALJ stated that the doctor found Ms. Vejvoda's range of motion in her spine to be within normal limits. (R. 16). That's not what the doctor reported, however, as he indicated that range of motion was barely half of normal, and that straight leg raising was positive. (R. 445). The Commissioner argues that because the chart in Dr. Patil's report lists "normals" as "0-90," the ALJ properly interpreted 50 degrees as within normal limits. (*Defendant's Response,* at 4-5). But this line of reasoning would allow the ALJ to interpret no range of motion at all as within normal limits; after all, the chart says "normals" are *zero* to ninety. That, of course, would be preposterous. No, clearly, the ALJ mischaracterized or misread Dr. Patil's findings.

Elsewhere in his decision, the ALJ discussed a report from a Dr. Patricia Strzembosz, noting that she had cleared Ms. Vejvoda for work in January 2006. (R. 16). He did not offer a citation to the record for this evidence, and neither did the Commissioner in his brief. The table of contents lists no report from a Dr. Strzembosz. The ALJ may have relied on this report in finding Ms. Vejvoda not disabled, or he may not have. What he did not do, in view of an 800-page record, is allow the court to locate the evidence in a massive record in order to perform a meaningful review. *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009); *Giles ex rel. Giles v. Astrue*, 483 F.3d 483, 487 (7th Cir. 2007).

Later in this section, the ALJ did provide a specific citation, to an x-ray that revealed degenerative changes in Ms. Vejvod'as lumbar spine along with the beginnings of oseophyte formation. (R. 16; R. 323). Curiously, he commented that "[t]here was no mention of the claimant's alleged back impairment." (R. 16). That's obviously a

contradiction from one sentence in the opinion to the next. As noted earlier, the "logical bridge" requirement has, rightly or wrongly, been called a lax one. *Berger*, 516 F.3d at 544. Many facets of the ALJ's decision in this case, however, are simply too opaque to meet that "lax" requirement.

## CONCLUSION

The plaintiff's motion for summary judgment or remand [#14] is GRANTED, and the Commissioner's motion for summary judgment is DENIED.

**ENTERED:** _____
**UNITED STATES MAGISTRATE JUDGE**

**DATE:** 5/6/11